**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LEGEND SMELTING AND RECYCLING, LLC, PGM OF TEXAS LLC, and ELEMENTAL USA, INC.,** | § | |
| *Plaintiffs,* | § | |
| v. | § | **Civil Action No. _______________** |
| **JOEL GLASER, OLIVER COOK, AMBER WORKMAN, SEAN DUANE, MATT CARTER, and REFINED CATALYST SOLUTIONS, LLC,** | § | |
| *Defendants.* | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs Legend Smelting and Recycling, LLC ("**Legend**"), PGM of Texas LLC ("**PGMoT**"), and Elemental USA, Inc. ("**Elemental**") file this Original Complaint (the "**Complaint**") against Defendants Joel Glaser ("**Glaser**"), Oliver Cook ("**Cook**"), Amber Workman ("**Workman**"), Sean Duane ("**Duane**"), Matt Carter ("**Carter**," and together with Glaser, Cook, and Workman, the "**Former Employees**"), and Refined Catalyst Solutions LLC ("**Refined Catalyst**").

## I. INTRODUCTION

1. This is a case about disloyal officers and employees who abused their positions to take a profitable business they did not build. Glaser served as CEO for Legend, PGMoT, and Elemental, all related entities. He was based out of Legend's facility in Ohio, where he worked closely with Cook and Workman, both also officers of Legend. Together, the Former Employees worked to steal equipment, misappropriate trade secret information, destroy devices and evidence, usurp corporate opportunities, and poach Legend's employees. They engaged in this conduct while

still employed by Plaintiffs and while Glaser coerced PGMoT to execute a separation agreement that purported to give him carte blanche to compete with PGMoT (but not the other Plaintiffs) and to operate a competing business. But Refined Catalyst is not just a competing business. It is a business built off the backs of Plaintiffs' decades of hard work, monetary investments, and development of goodwill, all of which allowed Plaintiffs to establish a foothold in the urban mining and recycling industry.

2. Indeed, the Former Employees used their roles as officers of Plaintiffs to gain access to Legend's most sensitive trade secret and proprietary information, took that information, and used it to set up an almost identical pricing application for Refined Catalyst. They sold equipment at under-market value—and, even worse, stole other pieces of equipment—and, upon information and belief, then used that same equipment to operate Refined Catalyst. They approached employees during Plaintiffs' pre-scheduled holiday shut-down over Christmas and New Year's Day, told them to show up at a different facility on the first business day without disclosing that it was the facility of a competing venture, and then proceeded to steal Legend's employees.

3. To put it simply: Defendants strategically raided every aspect of Plaintiffs' operations—physical equipment, intellectual property, key employees, customers, and vendors—and took it all for their own financial gain. Then, they undertook methodical and intentional efforts to cover up their tracks by spoliating evidence. And they have engaged in a campaign aimed at smearing the good name and reputation Plaintiffs built the good, old-fashioned way: with years of hard work.

4. Defendants' conduct makes clear they have no intention of competing fairly or playing by the rules. Accordingly, Plaintiffs bring this action to stop Defendants from profiting

from their greed and disloyalty, protect critical proprietary and trade secret information, and recover for the damage that Defendants have caused.

## II. PARTIES

5. Plaintiff Legend is a limited liability company organized under the laws of the State of Ohio, with a principal place of business in Hebron, Ohio. Legend may be served in this matter via its undersigned counsel of record.

6. Plaintiff PGMoT is a limited liability company organized under the laws of the State of Texas with a principal place of business in San Marcos, Texas. PGMoT may be served in this matter via its undersigned counsel of record.

7. Plaintiff Elemental is a corporation organized under the laws of the State of Delaware with a principal place of business in Wilmington, Delaware. Elemental may be served in this matter via its undersigned counsel of record.

8. Defendant Glaser is an individual and a citizen of the State of Ohio. Glaser may be served with process at 634 Hainshill Drive, Newark, Ohio 43055-7942.

9. Defendant Cook is an individual and a citizen of the State of Ohio. Cook may be served with process at 2165 Sunnyhill Drive NE, Lancaster, Ohio 43130-1170.

10. Defendant Workman is an individual and a citizen of the State of Ohio. Workman may be served with process at 9599 Cooper Road, Johnstown, Ohio 43031-9126.

11. Defendant Duane is an individual and a citizen of the State of Ohio. Duane may be served with process at 4380 State Route 204, Glenford, Ohio 43739-9781.

12. Defendant Carter is an individual and a citizen of the State of Ohio. Carter may be served with process at 5064 Pleasant Chapel Road, Newark, Ohio 43056.

13. Defendant Refined Catalyst is a limited liability company organized under the laws of the State of Ohio with a principal place of business in Newark, Ohio. Refined Catalyst may be

served with process via its registered agent, Joel Glaser, at 634 Hainshill Drive, Newark, Ohio 43055.

## III. JURISDICTION

14. The Court has jurisdiction over this lawsuit because the lawsuit arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, et seq. (the "**DTSA**"). Specifically, Legend has asserted a claim against Defendants for their misappropriation of Legend's trade secrets, which arises under the DTSA, a federal statute. *See* 28 U.S.C. § 1331.

15. Additionally, the Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law and common law claims because such claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## IV. VENUE

16. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants reside in this district and a substantial part of the events or omissions giving rise to these claims occurred in this district.

## V. FACTUAL BACKGROUND

### A. Plaintiffs' Business.

17. Plaintiffs are leaders in urban mining and recycling. Plaintiffs specialize in the recycling of platinum group metals ("**PGMs**"), a cluster of six noble, rare transition metals: platinum, palladium, rhodium, ruthenium, iridium, and osmium. PGMs are some of the most versatile metals in the world. They are used in everything from cell phones and solar panels to cancer treatments and computer components. However, they are also some of the rarest metals in the world. Therefore, recycling these valuable materials is crucial because it secures a

sustainable supply and allows for the continued development of technologies and processes that power modern life.

18. Legend was established in 1982 in Newark, Ohio as a small non-ferrous recycling center. When catalytic converters started entering salvage yards, Legend was one of the first companies to capitalize on this valuable resource. The company grew rapidly, opening more collection sites across Ohio and the rest of the United States. Today, Legend is a leader in the non-ferrous metals and catalytic converter recycling industry.

19. Given its over 40 years in the industry, Legend has developed a loyal customer base across the country, but particularly within Ohio. This tenure and strong marketplace position has also allowed Legend to compile significant proprietary information related to its customer base, products, and industry.

20. PGMoT was founded in 2010 in Dripping Springs, Texas, however its roots in catalytic converter recycling stretch back to 1999. Since then, decades of experience and technical expertise have combined to make PGMoT an industry leader. Like Legend, PGMoT has a strong brand reputation in the industry and a significant purchasing network across the United States.

21. Elemental is the U.S. entity for Elemental Holding Group, a worldwide company group with a strong position in the global supply chain of critical raw materials. The group, through Elemental, acquired PGMoT in 2019 and Legend in 2021. Although the entities collaborate with one another across the platform, they each continue to operate under their own brand and serve their own customer base developed across decades of prior work. Each has their own intellectual property, which was developed throughout its tenure in the industry, both before and after joining the Elemental group.

**B. Legend's Goodwill, Confidential Information, and Trade Secrets.**

22. Legend's business philosophy is that the most important aspect of its business is the relationships it develops with its customers. Accordingly, Legend expends significant time, resources, and money training its professional staff to provide great service and forge successful relationships.

23. Indeed, Legend's long-term success depends critically upon its ability to retain the strength of its services, customer relationships, and goodwill, and its ability to protect its confidential and trade secret information.

24. Among Legend's most important trade secret information is its pricing models, database, and customer lists. Legend invested decades in the industry and significant resources to develop a proprietary pricing model (the "**Pricing Model**") and compile customer and vendor lists (the "**Customer Lists**").

25. The Pricing Model consists of a comprehensive compilation of data, formulas, methodologies, and analyses, including: (a) proprietary pricing data reflecting the value assigned to specific categories, types, and models of catalytic converters based on their precious metal content; (b) proprietary yield data reflecting the quantities and concentrations of PGMs recoverable from specific categories and types of catalytic converters; (c) proprietary assay results, sampling methodologies, and recovery rate data; (d) algorithms, formulas, and analytical methods used to calculate the purchase price for catalytic converters based on variables including converter type, manufacturer, condition, and prevailing precious metal market prices; (e) supplier-specific and customer-specific pricing terms, volume data, discount structures, and margin calculations; and (f) the specific combination, arrangement, and interrelation of the foregoing data elements as integrated within the pricing model. The database contains very sensitive and trade secret

information including the Pricing Model and a compilation of known Spent Automotive Catalysts ("**SACs**") and detailed data gathered by Legend regarding the PGM content in each of them.

26. The Customer Lists consist of detailed, non-public compilations of information, including: (a) the identities of not just Legend's, but all of PGM Division's customers and prospective customers for recovered PGMs, together with each such customer's contact information, purchasing history, pricing terms, volume requirements, and product specifications; (b) the identities of PGM Division's vendors and suppliers of spent catalytic converters, together with each such vendor's and supplier's contact information, supply volume data, geographic sourcing information, pricing and payment terms, quality and yield history, and reliability assessments; (c) customer-specific and vendor-specific contract terms, negotiated pricing structures, discount arrangements, credit terms, and other pricing information; (d) strategic assessments of customer and vendor relationships, including profitability analyses, growth potential evaluations, and competitive intelligence regarding each customer's and vendor's alternative business relationships; and (e) the specific selection, compilation, and arrangement of the foregoing data, which in its totality reflects PGM Division's accumulated business judgment and industry expertise developed over decades spent in the catalytic converter recycling industry.

27. Legend goes to great lengths to protect its confidential, proprietary, and trade secret information. These measures include: (a) restricting access to those employees and authorized agents with a demonstrated business need to access such information; (b) maintaining such information on password-protected and encrypted computer systems with restricted user access controls; (c) implementing physical security measures at its facilities to prevent unauthorized access to areas where the information is stored or utilized; and (d) implementing and enforcing

company policies and procedures governing the handling, storage, and transmission of such information.

## C. The Former Employees' Employment with Plaintiffs.

### 1. Joel Glaser

28. Glaser's stepfather was one of the original owners of Legend. Presumably based on this relationship, Glaser began a lengthy period of on-and-off employment with Legend. Glaser had short employment stints with Legend totaling about three to four years of continuous service in approximately 17 calendar years. Other than his latest resignation, he last left the company in June 2016. He rejoined Legend in November 2019 as Chief Business Officer.

29. On or about January 3, 2024, Glaser also became employed by PGMoT as its Deputy Chief Operating Officer ("**COO**").

30. On January 23, 2025, Glaser was promoted to CEO of "PGM Division" and President of Legend. As CEO of PGM Division, Glaser oversaw "all US-based subsidiaries of Elemental Holdings S.A. in PGM Division," including, among others, PGMoT and Legend.

31. In his CEO roles, Glaser was permitted access to the most sensitive and proprietary information owned by Plaintiffs, including Legend.

32. Throughout the rest of 2025, PGMoT negotiated with Glaser regarding the terms of a written employment agreement. The agreement was finally reduced to writing in late November 2025 (the "**Employment Agreement**"), although it was effective dating back to January 23, 2025.

33. At the time of its execution, the parties understood and acknowledged that Glaser's execution of restrictive covenants was expected. Specifically, the Employment Agreement stated: "In the event neither Party exercises its or his right to terminate the agreement pursuant to

Section 4.5, the Parties will engage in negotiations over a non-compete, non-solicitation provision at the end of March 2026."

34. Although it did not include non-compete and non-solicitation obligations, the Employment Agreement did include non-disclosure obligations (the "**Non-Disclosure Provision**"), requiring Glaser to: (i) keep secret all Confidential Matters of PGMoT and the company group and not disclose them to anyone; and (ii) return all company materials and confidential information upon the termination of his employment or as requested by PGMoT.

35. In early-to-mid December 2025, Elemental sent Glaser proposals of the restrictive covenants contemplated by the Employment Agreement. Glaser refused to execute such agreements.

**2. Amber Workman**

36. Workman began her employment with Plaintiffs on or about November 9, 2021. She served as Legend's Vice President, Secretary, and COO. She also worked for Elemental in assay analysis and held an executive leadership role with oversight of operations in portions of Ohio, Michigan, Iowa, Illinois, Indiana, New York, and New Hampshire.

37. In her roles, Workman, too, had access to Legend's confidential and trade secret information. Specifically, Workman was responsible for financial analysis and hedging, including manually entering the market prices of materials into Legend's IT system. As such, Workman had intimate knowledge of Legend's proprietary Pricing Model and the confidential and proprietary information that went into it.

38. Additionally, Legend's human resources department reported to Workman, so Workman had intimate knowledge of Legend's confidential employment-related information such as compensation structures. In addition, she oversaw the processing of advance payments to individual suppliers and matters related to settlements with those vendors.

**3. Oliver Cook**

39. Legend hired Cook on or about November 9, 2021. He served as Legend's Chief Technical/Technology Officer.

40. Cook also had significant access to Legend's confidential and trade secret information. Specifically, Cook was responsible for development of the application containing Legend's Pricing Model and had access to the entire vendor database contained in the catalyst purchasing application used by PGM Division. In addition, he had information regarding the performance of individual buyers, along with a list of assigned clients for each of them. As such, he had direct access to databases, pricing information, transaction history, analytical models, and other proprietary, confidential, and trade secret information. As CTO, Cook had overall supervision of Legend's IT infrastructure and, accordingly, unfettered access to electronically stored information.

41. Glaser, Cook, and Workman all served as officers for Legend. Glaser and Workman also served in this capacity for Elemental. And Glaser was an officer of PGMoT. As such, all three owed fiduciary duties to Plaintiffs based on their respective officer roles.

**D. Glaser's Resignation and Exit Negotiations.**

42. On December 17, 2025, shortly after receiving drafts of the agreed-upon restrictive covenants, Glaser emailed his notice of resignation to Pawel Jarski, Elemental Holdings' CEO, and Hugo Schumann, Elemental's CEO. Glaser made clear that this was a "time sensitive matter" and rushed the companies to finalize a prompt exit strategy.

43. Schumann responded that same day acknowledging receipt and noting that "a standard release agreement will be entered into."

44. Determined on leaving as quickly as possible, Glaser sent his own draft separation agreement the very next day, December 18, 2025.

45. On December 22, 2025, Schumann sent Glaser a revised draft separation agreement, which significantly narrowed the broad releases and blanket rights in Glaser's draft.

46. The very next day, Glaser emailed back his own version of the separation agreement demanding *immediate* execution by the company.

47. Glaser's agreement contained mutual releases under which Glaser released claims against the "Company," which is defined as PGMoT, and "its past, present, insurers, subrogees, agents, attorneys, and representatives." Similarly, the Company, i.e., PGMoT, and "its past, present, and future officers, directors, stockholders, members, attorneys, agents servants, representatives, employees, parent companies, subsidiaries, insurers, agents, servants, representatives, employees, parent companies, subsidiaries, insurers, affiliates and related companies, partners, predecessors and successors in interest, and assigns," which are defined as the "Company Group," released Glaser from certain claims.

48. Critically, the released claims were specifically limited to those "relating in any way to Company's"—i.e., PGMoT's—employment of Glaser or Glaser's "execution of his duties while employed by Company," (again, PGMoT). In other words, the parties did not release any claims related to Glaser's employment and relationship with any of the other Elemental entities, including Legend. Moreover, the releases are limited to claims arising out of conduct occurring before December 23, 2025.

49. Glaser also added a provision stating that Glaser may "compete with [PGMoT], either through direct or indirect competition or through the solicitation of [PGMoT]'s employees." Although this seemed like a strange addition, it was merely confirmation that Glaser never executed a non-compete or non-solicit agreement with PGMoT.

50. What was stranger was Glaser's addition stating that PGMoT "will not enforce the restrictive covenants, including but not limited to, non-compete or non-solicitation provisions, set forth in any employment agreements of any current or former [PGMoT] employees who leave their employment with [PGMoT] to work for Glaser . . . ."

51. Schumann felt extreme pressure from Glaser to execute the Separation Agreement. In any event, Glaser had not given Plaintiffs any indication that he had any plans to poach any of the company parties' employees, steal equipment and trade secret information, or engage in any other tortious or unlawful behavior. More significantly, he did not disclose that he had already undertaken these acts. So, to put an end to the distraction Glaser was causing, PGMoT agreed to Glaser's draft of the separation agreement.

52. PGMoT and Glaser signed the agreement that same day, December 23, 2025 (the "**Separation Agreement**").

53. In addition to the clauses described above, the Separation Agreement also contained a requirement under which Glaser was required to, within one week of his separation date:

> return all Company property (including, but not limited to, laptop computers, desktop computers, phones, tablets, keys, key fobs or cards, bank account information and/or company credit cards (whether electronically stored or otherwise), company vehicles, hard drives, portable storage devices, Company confidential information and trade secrets, and any other hard copy and electronically created or stored documents and information, such as Word documents, .pdfs, Excel spreadsheets, .jpgs, .tiffs, .psts, and/or other images or pictures, contacts, texts, chat messages, and emails) within [Glaser]'s possession, custody, or control, including on any cloud-based storage service or facility, portable electronic storage device, computer, phone, or other electronic storage device.

54. Additionally, Glaser was required to "provide[] [PGMoT] all usernames, passwords, credentials, access rights, dual verification codes, answers to verification questions, and all other log-in information necessary to access any Company documents, databases, networks, or other information."

55. Further, Glaser also agreed not to defame Plaintiffs. Specifically, Glaser acknowledged and agreed:

> [T]he business reputation and goodwill of [PGMoT] and its former, current, and prospective clients, customers, officers, directors, employees, members, partners, current, and prospective clients, customers, officers, directors, employees, members, partners, managers, owners, agents, or representatives are valuable assets critical to [PGMoT]'s goodwill and business relationships and to the continued growth, sustainability and success of [PGMoT]. Accordingly, [Glaser] will not defame [PGMoT]; [PGMoT] former, current, or prospective clients or customers; or their respective former, current, or prospective officers, directors, employees, members, partners, managers, owners, agents, or representatives, or their respective products or services.

56. Starting the next day, December 24, 2025, all Legend facilities closed for Christmas break. The facilities remained closed through January 4, 2026.

**E. Workman, Cook, and Other Employees Resign and Join Forces with Glaser to Unfairly Compete with Plaintiffs.**

57. On January 5, 2026, both Workman and Cook submitted their resignations to Legend and Elemental.

58. The next day, Glaser formally incorporated Refined Catalyst as an Ohio limited liability company. Glaser is listed as Refined Catalyst's registered agent.

59. The formation documents list Refined Catalyst's stated purpose as: "To engage in business of precious metals recycling, and any business that is incidental or consequential thereto." In other words, Refined Catalyst's express intended purpose is to compete with Plaintiffs.

60. According to LinkedIn, Cook is a "Managing Member" of Refined Catalyst and Workman is the "Managing Partner."

61. Carter resigned his Legend employment shortly after the others. Upon information and belief, he has taken actions to assist Glaser and Refined Catalyst solicit Plaintiffs' clients. On or about May 28, 2026, Legend sent Carter a cease-and-desist letter demanding that he cease further actions in violation of his restrictive covenants. On June 5, 2026, Carter responded to this

letter, via counsel. Carter's letter stated that "even if he was" in violation of his agreements with Legend, his actions were permissible based on the questionable release Glaser extracted from PGMoT and because Carter believes the restrictive covenants are unenforceable. Notably, however, ***Carter did not deny that he had taken any actions in violation of his non-solicitation or non-disclosure obligations*** owed to Legend.

**F. Plaintiffs Discover Defendants' Past and Ongoing Wrongful Conduct.**

62. While Plaintiffs and their employees took the Christmas break to celebrate and spend time with their families, Defendants instead took this time to raid Legend for its employees, equipment, confidential and trade secret information, and customers.

63. Before employees were set to return on January 5, Mike Stevens ("**Stevens**")—the Newark facility's plant manager—reached out to employees and told them to report to a new building on Norton Avenue their first day back. Stevens did not disclose to Legend's employees that this was not a Legend facility but instead Refined Catalyst's new site.

64. Upon information and belief, Stevens and Defendants solicited employees to leave their Legend employment and join Refined Catalyst when they all showed up at Norton Avenue.

65. Indeed, several employees submitted resignations that very day, including Stevens and Duane. All conceded that Glaser had offered them a job with his new company.

66. To date, approximately 35 employees have left Legend to join Glaser's new venture.

67. Other employees have reported that Glaser approached them and solicited them to leave Legend and join his new company.

68. But that is not all. When the Legend facilities opened again in January, Plaintiffs also discovered that several pieces of equipment were missing from one of its locations. Upon

information and belief, this equipment was removed by, or at the direction of, Defendants while everyone else was away for the holiday break.

69. The Former Employees also did not wait until their resignations to engage in wrongful conduct harmful to Plaintiffs. Plaintiffs have also discovered that while Glaser was still employed by Legend, Glaser and Duane orchestrated the sale of Legend equipment to Duane's father-in-law. When Duane showed up to pick up the purchased equipment, he took additional equipment that was not part of the sale. The stolen equipment included electrical boxes, hydraulic tanks, motors, bases, and stands, which totaled approximately $40,000 to $60,000.

70. Upon information and belief, none of this equipment—whether purchased or stolen—was intended for Duane's father-in-law but instead was purchased for the purpose of setting up Refined Catalyst, all while the Former Employees were still employed by Legend and other Plaintiff entities.

71. Defendants' theft did not stop at equipment. Indeed, Plaintiffs believe Defendants took their confidential information and trade secrets—during and after their employment—and used it to set up Refined Catalyst so that it was immediately up and running upon their departures from Legend. Specifically, Plaintiffs believe Defendants stole Legend's Pricing Model and used the data to set up a competing application that looks very similar, contains the same information, and appears to be based on the same principles and code as Legend's application.

72. To cover up their tracks, Defendants engaged in conversion and spoliation of evidence. Specifically, departing Legend employees deleted data from their company-issued cell phones and removed SIM cards from their phones prior to returning them. Stevens deleted everything from his Legend computer.

73. Defendants have not been satisfied with just stealing equipment, confidential and trade secret information, and employees to create their competing venture. They insist on taking everything from Legend, including its reputation, goodwill, and standing in the market. Plaintiffs have received several reports that Glaser, directly or indirectly, has been spreading false and harmful information about Plaintiffs. For example, Glaser has claimed that Elemental is "nearing bankruptcy" and that one of its executives is "going to jail."

74. These statements are false. However, they worked. Indeed, Defendants managed to convince several customers to leave Legend and, instead, conduct business with Refined Catalyst.

## VI. CAUSES OF ACTION

### COUNT 1—MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. §§ 1836 *et seq.*)

**(Legend Against All Defendants)**

75. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully set forth herein.

76. Legend is engaged in the business of recycling catalytic converters for the recovery and sale of PGMs and other precious metals. Over the course of many years and at substantial expense, Legend developed and compiled confidential information. This includes, but is not limited to, Legend's proprietary Pricing Model for catalytic converters and Customer Lists.

77. The Pricing Model consists of a comprehensive compilation of data, formulas, methodologies, and analyses, including, but not limited to, (a) proprietary pricing data reflecting the value assigned to specific categories, types, and models of catalytic converters based on their precious metal content; (b) proprietary yield data reflecting the quantities and concentrations of PGMs recoverable from specific categories and types of catalytic converters; (c) proprietary assay results, sampling methodologies, and recovery rate data; (d) algorithms, formulas, and analytical

methods used to calculate the purchase price for catalytic converters based on variables including converter type, manufacturer, condition, and prevailing precious metal market prices; (e) supplier-specific and customer-specific pricing terms, volume data, discount structures, and margin calculations; and (f) the specific combination, arrangement, and interrelation of the foregoing data elements as integrated within the pricing model.

78. The Customer Lists consist of detailed, non-public compilations of information, including but not limited to: (a) the identities of Legend's customers and prospective customers for recovered PGMs, together with each such customer's contact information, purchasing history, pricing terms, volume requirements, and product specifications; (b) the identities of Legend's vendors and suppliers of spent catalytic converters, together with each such vendor's and supplier's contact information, supply volume data, geographic sourcing information, pricing and payment terms, quality and yield history, and reliability assessments; (c) customer-specific and vendor-specific contract terms, negotiated pricing structures, discount arrangements, credit terms, and other pricing information not publicly disclosed; (d) strategic assessments of customer and vendor relationships, including profitability analyses, growth potential evaluations, and competitive intelligence regarding each customer's and vendor's alternative business relationships; and (e) the specific selection, compilation, and arrangement of the foregoing data, which in its totality reflects PGM Division's accumulated business judgment and industry expertise developed over decades spent in the catalytic converter recycling industry.

79. The Pricing Model and Customer Lists constitute trade secret information within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* and are referred to collectively herein as the "**Trade Secret Information**."

80. The Trade Secret Information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from its disclosure or use, within the meaning of 18 U.S.C. § 1839(3)(B). Specifically, Legend's Trade Secret Information provides Legend with a significant competitive advantage in the catalytic converter recycling industry by enabling Legend to accurately and efficiently determine the precious metal value of catalytic converters, price its purchases accordingly, and optimize its recovery margins. Similarly, the Customer Lists provide Legend with a significant competitive advantage by enabling Legend to maintain and leverage established relationships with reliable suppliers of spent catalytic converters and purchasers of recovered precious metals, relationships that were cultivated over years of business dealings and that could not be readily replicated by a competitor. The Customer Lists reflect not merely the identities of Legend's customers and vendors, but a wealth of non-public, particularized information regarding the specific needs, preferences, pricing expectations, and transaction histories of each customer and vendor, the compilation and analysis of which required substantial time, effort, and expense. Competitors and other market participants do not have access to the data, yield information, or pricing formulas embodied in the Pricing Model, nor do they have access to the detailed, particularized customer and vendor information contained in the Customer Lists. A competitor could not independently develop or replicate this information without undertaking a comparable investment of years of time, effort, and expense.

81. The Trade Secret Information is not publicly available, is not published in any industry reference or trade directory and cannot be derived through reverse engineering or other proper means. While the identities of some of Legend's customers and vendors may be known within the industry, the specific compilation of detailed, particularized information associated with

each customer and vendor, including pricing terms, volume data, yield history, profitability assessments, and the interrelationship of such data, is not generally known or readily ascertainable. Disclosure or use of the Trade Secret Information by a competitor or other unauthorized party would diminish or destroy the economic value of the information and cause Legend substantial and irreparable competitive harm.

82. Legend has taken reasonable measures to maintain the secrecy of its Trade Secret Information, within the meaning of 18 U.S.C. § 1839(3)(A). These measures include, but are not limited to: (a) restricting access to those employees and authorized agents with a demonstrated business need to access such information; (b) maintaining the Trade Secret Information on password-protected and encrypted computer systems with restricted user access controls; (c) implementing physical security measures at its facilities to prevent unauthorized access to areas where the Trade Secret Information is stored or utilized; and (d) implementing and enforcing company policies and procedures governing the handling, storage, and transmission of confidential and proprietary information. At no time has Legend voluntarily disclosed the Trade Secret Information to the public or otherwise permitted its Trade Secret Information to become generally known within the catalytic converter recycling industry or otherwise.

83. Defendants misappropriated Legend's Trade Secret Information within the meaning of 18 U.S.C. § 1839(5). As a result of the Former Employees' employment with Legend, Defendants came into possession of the Trade Secret Information. They were required to maintain this information confidential as a term of their Legend employment. Legend granted the Former Employees access to this information solely for the purpose of fulfilling their responsibilities and obligations as officers and employees of Legend. However, the Former Employees took this Trade Secret Information without consent and disclosed it to, among others, Refined Catalyst. Together,

Defendants have used this information without authorization for the unauthorized and wrongful purpose of unfairly competing with Plaintiffs. Specifically, Defendants sought to avoid the time and monetary investment associated with building such a robust Pricing Model and Customer Lists on their own and, instead, opted to steal Legend's Trade Secret Information to ensure Refined Catalyst was fully operational upon the Former Employees leaving Legend's employment. Besides being a violation of the DTSA, these disclosures and unauthorized uses were also violations of the Former Employees' obligations to Legend, which further demonstrates acquisition via improper means.

84. Legend's Trade Secret Information is related to a product or service used in, or intended for use in, interstate commerce, within the meaning of 18 U.S.C. § 1836(b)(1). Legend's catalytic converter recycling operations involve the purchase of catalytic converters from suppliers located across multiple states, the sale and delivery of recovered precious metals to customers in interstate commerce, and the use of pricing information that directly pertains to commodities traded on national markets.

85. As a result of Defendants' misappropriation of Legend's Trade Secret Information, Legend has suffered and continues to suffer damages, including but not limited to actual losses and unjust enrichment, and is entitled to relief under 18 U.S.C. § 1836(b)(3), including compensatory damages, exemplary damages, and reasonable attorneys' fees, as well as permanent injunctive relief to prevent the continued misappropriation, use, or disclosure of the Trade Secret Information.

## COUNT 2—MISAPPROPRIATION OF TRADE SECRETS UNDER THE OHIO UNIFORM TRADE SECRET ACT (Ohio Revised Code §§ 1333.61 *et seq.*)

**(Legend Against All Defendants)**

86. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully set forth herein.

87. Legend is engaged in the business of recycling catalytic converters for the recovery and sale of PGMs and other precious metals. Over the course of many years and at substantial expense, Legend developed and compiled confidential information. This includes, but is not limited to, the Pricing Model and the Customer Lists.

88. The Pricing Model consists of a comprehensive compilation of data, formulas, methodologies, and analyses, including, but not limited to, (a) proprietary pricing data reflecting the value assigned to specific categories, types, and models of catalytic converters based on their precious metal content; (b) proprietary yield data reflecting the quantities and concentrations of PGMs recoverable from specific categories and types of catalytic converters; (c) proprietary assay results, sampling methodologies, and recovery rate data; (d) algorithms, formulas, and analytical methods used to calculate the purchase price for catalytic converters based on variables including converter type, manufacturer, condition, and prevailing precious metal market prices; (e) supplier-specific and customer-specific pricing terms, volume data, discount structures, and margin calculations; and (f) the specific combination, arrangement, and interrelation of the foregoing data elements as integrated within the pricing model.

89. The Customer Lists consist of detailed, non-public compilations of information, including but not limited to: (a) the identities of Legend's customers and prospective customers for recovered PGMs, together with each such customer's contact information, purchasing history, pricing terms, volume requirements, and product specifications; (b) the identities of Legend's

vendors and suppliers of spent catalytic converters, together with each such vendor's and supplier's contact information, supply volume data, geographic sourcing information, pricing and payment terms, quality and yield history, and reliability assessments; (c) customer-specific and vendor-specific contract terms, negotiated pricing structures, discount arrangements, credit terms, and other pricing information not publicly disclosed; (d) strategic assessments of customer and vendor relationships, including profitability analyses, growth potential evaluations, and competitive intelligence regarding each customer's and vendor's alternative business relationships; and (e) the specific selection, compilation, and arrangement of the foregoing data, which in its totality reflects PGM Division's accumulated business judgment and industry expertise developed over decades spent in the catalytic converter recycling industry.

90. The Pricing Model and Customer Lists constitute trade secret information within the meaning of the Ohio Uniform Trade Secret Act, Ohio Revised Code §§ 1333.61 *et seq*., and are referred to collectively herein as the "**Trade Secret Information**."

91. The Trade Secret Information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from its disclosure or use, within the meaning of the Ohio Uniform Trade Secret Act. Specifically, Legend's Trade Secret Information provides Legend with a significant competitive advantage in the catalytic converter recycling industry by enabling Legend to accurately and efficiently determine the precious metal value of catalytic converters, price its purchases accordingly, and optimize its recovery margins. Similarly, the Customer Lists provide Legend with a significant competitive advantage by enabling Legend to maintain and leverage established relationships with reliable suppliers of spent catalytic converters and purchasers of recovered precious metals, relationships that were cultivated over

years of business dealings and that could not be readily replicated by a competitor. The Customer Lists reflect not merely the identities of Legend's customers and vendors, but a wealth of non-public, particularized information regarding the specific needs, preferences, pricing expectations, and transaction histories of each customer and vendor, the compilation and analysis of which required substantial time, effort, and expense. Competitors and other market participants do not have access to the data, yield information, or pricing formulas embodied in the Pricing Model, nor do they have access to the detailed, particularized customer and vendor information contained in the Customer Lists. A competitor could not independently develop or replicate this information without undertaking a comparable investment of years of time, effort, and expense.

92. The Trade Secret Information is not publicly available, is not published in any industry reference or trade directory and cannot be derived through reverse engineering or other proper means. While the identities of some of Legend's customers and vendors may be known within the industry, the specific compilation of detailed, particularized information associated with each customer and vendor, including pricing terms, volume data, yield history, profitability assessments, and the interrelationship of such data, is not generally known or readily ascertainable. Disclosure or use of the Trade Secret Information by a competitor or other unauthorized party would diminish or destroy the economic value of the information and cause Legend substantial and irreparable competitive harm.

93. Legend has taken reasonable measures to maintain the secrecy of its Trade Secret Information, within the meaning of the Ohio Uniform Trade Secret Act. These measures include, but are not limited to: (a) restricting access to those employees and authorized agents with a demonstrated business need to access such information; (b) maintaining the Trade Secret Information on password-protected and encrypted computer systems with restricted user access

controls; (c) implementing physical security measures at its facilities to prevent unauthorized access to areas where the Trade Secret Information is stored or utilized; and (d) implementing and enforcing company policies and procedures governing the handling, storage, and transmission of confidential and proprietary information. At no time has Legend voluntarily disclosed the Trade Secret Information to the public or otherwise permitted its Trade Secret Information to become generally known within the catalytic converter recycling industry or otherwise.

94. Defendants misappropriated Legend's Trade Secret Information within the meaning of the Ohio Uniform Trade Secret Act. As a result of the Former Employees' employment with Legend, Defendants came into possession of the Trade Secret Information. They were required to maintain this information confidential as a term of their Legend employment. Legend granted the Former Employees access to this information solely for the purpose of fulfilling their responsibilities and obligations as officers and employees of Legend. However, the Former Employees took this Trade Secret Information without consent and disclosed it to, among others, Refined Catalyst. Together, Defendants have used this information without authorization for the unauthorized and wrongful purpose of unfairly competing with Plaintiffs. Specifically, Defendants sought to avoid the time and monetary investment associated with building such a robust pricing model and customer and vendor lists on their own and, instead, opted to steal Legend's Trade Secret Information to ensure Refined Catalyst was fully operational upon the Former Employees leaving Legend's employment. Besides being a violation of the Ohio Uniform Trade Secret Act, these disclosures and unauthorized uses were also violations of the Former Employees' obligations to Legend, which further demonstrates acquisition via improper means.

95. Legend's Trade Secret Information is related to a product or service used in, or intended for use in, interstate commerce. Legend's catalytic converter recycling operations involve

the purchase of catalytic converters from suppliers located across multiple states, the sale and delivery of recovered precious metals to customers in interstate commerce, and the use of pricing information that directly pertains to commodities traded on national markets.

96. As a result of Defendants' misappropriation of Legend's trade secret information, Legend has suffered and continues to suffer damages, including but not limited to actual losses and unjust enrichment, and is entitled to relief under the Ohio Uniform Trade Secret Act, including compensatory damages, exemplary damages, and reasonable attorneys' fees, as well as permanent injunctive relief to prevent the continued misappropriation, use, or disclosure of the trade secret information.

**COUNT 3—BREACH OF FIDUCIARY DUTIES**

**(Legend Against Glaser, Cook, and Workman)**

97. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully set forth herein.

98. By virtue of their positions as officers and directors at Legend, Glaser, Cook, and Workman were in a position of trust and confidence with regard to Legend and owed fiduciary duties to Legend, including, but not limited to, the duty of loyalty, care, good faith, and disclosure. Specifically, at all relevant times, Glaser was Legend's CEO, Chief Business Officer, and President of the Board; Cook was Legend's Chief Technology Officer; and Workman was Legend's Vice President and Secretary of the Company and COO.

99. Glaser, Cook, and Workman breached their fiduciary duties to Legend by, among other things, (a) setting up a competing business while they were still employed by Legend, and actively competing during their employment via this business by soliciting employees, customers, and vendors; using company time and resources; and engaging in the other acts described herein; (b) stealing equipment from Legend for their use at the competing business; (c) entering into deals

on behalf of Legend that were detrimental to Legend's interests but favored Glaser, Cook, and Workman; (d) usurping Legend's corporate opportunities and diverting such opportunities to Refined Catalyst; (e) taking and using Legend's Trade Secret Information, other confidential information, and company property to unfairly compete with Legend and usurp its corporate opportunities; (f) raiding Legend and poaching its employees while all were still employed by Legend; (g) failing to disclose conflicts, material business opportunities, and/or conflicted negotiations; and (h) acting to benefit themselves at the expense of Legend.

100. Legend has suffered damages that were proximately caused by Glaser, Cook, and Workman's breaches of fiduciary duties, including, but not limited to, the value of the stolen company property, confidential information, and Trade Secret Information, lost profits Legend would have received if business opportunities had not been diverted and usurped, and other monetary damages. Additionally, as a direct result of Glaser, Cook, and Workman's conduct, Legend is entitled to equitable remedies, including, but not limited to, disgorgement of profits.

101. Glaser, Cook, and Workman's breaches were malicious and intentional, for which Legend is entitled to disgorgement of all compensation paid to Glaser, Cook, and Workman during the time they were breaching their fiduciary duties owed to Legend, as well as an award of exemplary and punitive damages.

**COUNT 4—BREACH OF FIDUCIARY DUTIES**

**(PGMoT Against Glaser)**

102. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully set forth herein.

103. By virtue of his position as an officer of PGMoT, Glaser was in a position of trust and confidence with regard to PGMoT and owed fiduciary duties to PGMoT, including, but not

limited to, the duty of loyalty, care, good faith, and disclosure. Specifically, at all relevant times, Glaser was PGMoT's CEO or Deputy COO.

104. Glaser breached his fiduciary duties to PGMoT by, among other things, (a) setting up a competing business while he was still employed by PGMoT, and actively competing during his employment via this business by soliciting employees, vendors, and customers; using company time and resources; and engaging in the other acts described herein; (b) acting to benefit himself at the expense of PGMoT and the Elemental Group companies, including Legend, which were part of Glaser's oversight and responsibilities as CEO of PGMoT; (c) engaging in self-dealing transactions; (d) failing to disclose conflicts, material business opportunities, and/or conflicted negotiations; (e) failing to perform his duties with the care of an ordinarily prudent person in a like position under similar circumstances and, instead, engaging in reckless operational decisions causing harm to PGMoT and the Elemental Group, engaging in grossly inattentive management, and not undertaking his duties in good faith by, among other things, taking actions that were opposed to the company's best interests; and (f) usurping company opportunities.

105. PGMoT has suffered damages that were proximately caused by Glaser's breaches of fiduciary duties, including, but not limited to, lost profits it would have received if business opportunities had not been diverted and usurped, and other monetary damages. Additionally, as a direct result of Glaser's conduct, PGMoT is entitled to equitable remedies, including, but not limited to, disgorgement of profits.

106. Glaser's breaches were malicious and intentional, for which PGMoT is entitled to disgorgement of all compensation paid to Glaser during the time he was breaching his fiduciary duties owed to PGMoT, as well as an award of exemplary and punitive damages.

## COUNT 5—BREACH OF FIDUCIARY DUTIES

## (Elemental Against Glaser and Workman)

107. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully set forth herein.

108. By virtue of their position as officers of Elemental, Glaser and Workman were in a position of trust and confidence with regard to Elemental and owed fiduciary duties to Elemental, including, but not limited to, the duty of loyalty, care, good faith, and disclosure. Specifically, at all relevant times, Glaser was Elemental's CEO and President; Workman held an executive leadership role for the North region.

109. Glaser and Workman breached their fiduciary duties to Elemental by, among other things, (a) setting up a competing business while they were still employed by Elemental, and actively competing during their Elemental employment via this business by soliciting employees and customers, using company time and resources, and engaging in the other acts described herein; (b) acting to benefit themselves at the expense of Elemental and its group of companies, including Legend, which were part of Glaser's oversight and responsibilities as CEO of PGMoT and Workman's region; (c) engaging in self-dealing transactions; (d) failing to disclose conflicts, material business opportunities, and/or conflicted negotiations; (e) failing to perform their duties with the care of an ordinarily prudent person in a like position under similar circumstances and, instead, engaging in reckless operational decisions causing harm to Elemental and its group of companies, engaging in grossly inattentive management, and not undertaking their duties in good faith by, among other things, taking actions that were opposed to the company's best interests; and (f) usurping company opportunities.

110. Elemental has suffered damages that were proximately caused by Glaser's and Workman's breaches of fiduciary duties, including, but not limited to, lost profits it would have

received if business opportunities had not been diverted and usurped, and other monetary damages. Additionally, as a direct result of Glaser's and Workman's conduct, Elemental is entitled to equitable remedies, including, but not limited to, disgorgement of profits.

111. Glaser's and Workman's breaches were malicious and intentional, for which Elemental is entitled to disgorgement of all compensation paid to Glaser and Workman during the time they were breaching their fiduciary duties owed to Elemental, as well as an award of exemplary and punitive damages.

**COUNT 6—BREACH OF CONTRACT**

**(PGMoT Against Glaser)**

112. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully set forth herein.

113. The Separation Agreement is a valid and enforceable agreement between PGMoT and Glaser.

114. Pursuant to the Separation Agreement, Glaser agreed to "not defame [PGMoT]; [PGMoT] former, current, or prospective clients or customers; or their respective former, current, or prospective officers, directors, employees, members, partners, managers, owners, agents, or representatives, or their respective products or services."

115. In the Separation Agreement, Glaser also agreed that within one week of his separation date he would "return all Company property (including, but not limited to, laptop computers, desktop computers, phones, tablets, keys, key fobs or cards, bank account information and/or company credit cards (whether electronically stored or otherwise), company vehicles, hard drives, portable storage devices, Company confidential information and trade secrets, and any other hard copy and electronically created or stored documents and information, such as Word documents, .pdfs, Excel spreadsheets, .jpgs, .tiffs, .psts, and/or other images or pictures, contacts,

texts, chat messages, and emails) within [Glaser]'s possession, custody, or control, including on any cloud-based storage service or facility, portable electronic storage device, computer, phone, or other electronic storage device."

116. PGMoT has performed all its duties and obligations under the Separation Agreement, including remittance of the separation payment referenced in Section 2.2 of the Separation Agreement.

117. Glaser breached his obligations under the Separation Agreement by among other things: (a) defaming PGMoT and its officers, directors, employees, members, partners, managers, owners, agents, or representatives, or their respective products or services; (b) misappropriating and failing to return PGMoT's and its related entities' confidential information and property; (c) destroying, and directing others to destroy, PGMoT's and its related entities' property, including information stored on electronic devices and the devices themselves; and (d) stealing equipment from PGMoT and its related entities.

118. As a direct and proximate result of Glaser's breach of the Separation Agreement, PGMoT has suffered and will suffer damages and has been forced to incur attorneys' fees and costs. PGMoT seeks recovery of all damages, fees, and costs herein.

**COUNT 7—COMMON LAW UNFAIR COMPETITION**

**(All Plaintiffs Against All Defendants)**

119. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully set forth herein.

120. Defendants directly and indirectly engaged in conduct constituting unfair competition under Ohio common law. Specifically, Defendants have engaged in gossip and spreading of rumors regarding Plaintiffs and their business. For example, Glaser has claimed that Elemental is "nearing bankruptcy" and that one of its executives is "going to jail." Additionally,

Defendants wrongfully obtained Legend's Trade Secret Information and equipment and used it to set up Refined Catalyst's operations to directly compete and take away business from Plaintiffs.

121. The gossip and rumors stated by Defendants were false.

122. These statements were made with malicious intent. Specifically, Defendants made these statements, known to be false and misleading, to customers, vendors, and other individuals with relationships with Plaintiffs with the specific intent of harming Plaintiffs' standing in the marketplace. Defendants sought to take these customers and vendors from Plaintiffs and rather than fairly competing, Defendants attempted to take a stake in the marketplace by spreading false rumors, stealing and using Plaintiffs' equipment and Trade Secret Information, and engaging in other unethical and wrongful conduct specifically designed to harm Plaintiffs.

123. Plaintiffs have suffered damages as a direct and proximate result of Defendants' unfair competition.

**COUNT 8—TORTIOUS INTERFERENCE**

**(Legend Against All Defendants)**

124. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully set forth herein.

125. Legend has established and prospective contractual and business relationships with customers and vendors in the marketplace. Additionally, Legend has established relationships with its employees.

126. Defendants knew of these business and contractual relationships by virtue of the Former Employees' employment with Legend. Indeed, Defendants wrongfully took Legend's Customer List and, as such, have intimate knowledge of details regarding Legend's business and contractual relationships with its customers and vendors. Likewise, the Former Employees'

management-level roles within Legend ensured they had knowledge of Legend's employment relationships and the terms thereof.

127. Defendants have tortiously interfered with Legend's contractual and business relationships with its vendors and clients causing clients and vendors to cease to conduct business with Legend. Specifically, Defendants misappropriated Legend's Customer Lists and used such Trade Secret Information to specifically target these customers and vendors for the purpose of soliciting and inducing them to terminate their relationships with Legend, cease doing business with Legend, and, instead, conduct business with the competing venture they set up—Refined Catalyst. Defendants have also tortiously interfered with Legend's contractual and business relationships with its employees by soliciting them to terminate their employment with Legend and instead join Refined Catalyst. Specifically, Defendants—directly and indirectly—arranged for a number of employees to show up at Refined Catalyst instead of Legend on the first day back at work following the holiday break, at which point the employees were solicited to leave Legend's employment. Additionally, Glaser has reached out to several Legend employees and directly solicited them to leave Legend and join Refined Catalyst.

128. Defendants' interference with Legend's business and contractual relationships with vendors, clients, and employees was undertaken knowingly, maliciously, and without right, privilege, or justification. Moreover, Defendants undertook their tortious conduct with the specific intent of gaining their own economic benefit and personal gain and to specifically harm Plaintiffs.

129. As a proximate result of Defendants' tortious interference, Legend has suffered actual and exemplary damages to its business for which it now seeks recovery.

**COUNT 9—CONVERSION**

**(Legend Against All Defendants)**

130. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully set forth herein.

131. Legend had ownership or right of possession over its equipment (including, but not limited to, electrical boxes, hydraulic tanks, motors, bases, and stands) and materials, electronic devices (including company-issued cell phones, laptops, and desktop computers), and Trade Secret Information.

132. Defendants converted Legend's equipment by physically removing it from Legend's facility, taking it to Refined Catalyst's facilities, and depriving Legend of its possession. Further, they converted other pieces of equipment by depriving Legend of its possession and "selling" such equipment to Duane's father-in-law at below market prices, in contravention of their fiduciary and other duties owed to Legend. Defendants converted Legend's electronic devices by removing and/or destroying electronic data found on these devices, destroying the charging port to Workman's cell phone, and taking other acts to destroy and/or harm these devices and the information stored thereon. Finally, Defendants converted Legend's Trade Secret Information by wrongfully taking possession of it and using it to unfairly compete with Legend and the other Plaintiffs.

133. As a proximate result of Defendants' conversion, Legend has suffered actual and exemplary damages to its business for which it now seeks recovery.

**COUNT 10—CONSPIRACY**

**(All Plaintiffs Against All Defendants)**

134. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully set forth herein.

135. Defendants combined to engage in the wrongful conduct described herein. This combination was malicious and carried out with the specific purpose of causing injury to Plaintiffs.

136. Defendants' malicious conduct caused injury to Plaintiffs and their property. Specifically, Defendants combined to, among other things, misappropriate Legend's Trade Secret Information; steal and destroy Legend's equipment, electronic devices, and materials; usurp corporate opportunities from Plaintiffs; and tortiously interfere with Legend's contractual and business opportunities. These acts caused monetary injury, physically deprived Plaintiffs of their property and opportunities, and destroyed Plaintiffs' property.

137. Defendants engaged in unlawful acts independent of the conspiracy itself. By example, Defendants engaged in the following unlawful acts: misappropriation of Legend's Trade Secret Information; setting up and operating a competing business during their employment and using Plaintiffs' time, resources, property, and facilities for the operation of such competing venture; stealing and destroying Legend's equipment, electronic devices, and materials; usurpation of corporate opportunities from Plaintiffs; tortious interference with Plaintiffs' contractual and business opportunities; making of false rumors and defamatory statements about Plaintiffs; and the many other acts described in this Complaint.

138. As a proximate result of Defendants' conspiracy and underlying unlawful acts, Plaintiffs have suffered actual and exemplary damages to their business for which they now seek recovery.

## VII. PRAYER

For the foregoing reasons, Plaintiffs respectfully pray for judgment and relief against Defendants as follows:

a. For judgment in favor of Plaintiffs and against Defendants on all causes of action in the Complaint;

b. For an order directing Defendants to return all of Plaintiffs' information and property in their possession, custody, or control;

c. For permanent injunctive relief to prevent Defendants' continued misappropriation, use, or disclosure of the Trade Secret Information;

d. For actual damages;

e. For pre-judgment and post-judgment interest;

f. For restitution and disgorgement of all ill-gotten gains;

g. For Plaintiffs' reasonable attorneys' fees and court costs;

h. For punitive and exemplary damages; and

i. For all other relief the Court deems appropriate.

[*signature page follows*]

Dated: July 1, 2026. Respectfully Submitted,

/s/ Marissa A. Peirsol
Marissa A. Peirsol, *Trial Attorney*
Ohio State Bar No. 0098203
mpeirsol@bakerlaw.com
**BAKER & HOSTETLER LLP**
200 Civic Center Drive
Suite 1200
Columbus, Ohio 43215
Tel: (614) 228-1541

Marc D. Katz
(*pro hac vice* application forthcoming)
Texas State Bar No. 00791002
marc.katz@vkhh.com
Toby M. Galloway
(*pro hac vice* application forthcoming)
Texas Bar No. 00790733
toby.galloway@vkhh.com
Maria A. Garrett
(*pro hac vice* application forthcoming)
Texas State Bar No. 24099673
maria.garrett@vkhh.com
Catherine Pritchard
(*pro hac vice* application forthcoming)
Texas State Bar No. 24116910
catherine.pritchard@vkhh.com
**VARTABEDIAN KATZ HESTER & HAYNES LLP**
2200 Ross Avenue
Suite 4200W
Dallas, Texas 75201
Tel: (469) 654-1340

***Attorneys for Plaintiffs Legend Smelting and Recycling, LLC, PGM of Texas LLC, and Elemental USA, Inc.***